UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| JODY ZELLNER-DION, on behalf of herself and all others similarly situated, | Case No. 10-CV-2587 (PJS/JSM) |
| Plaintiff, | |
| v. | ORDER |
| WILMINGTON FINANCE, INC., | |
| Defendant. | |

---

Douglas L. Micko and Richard J. Fuller, SCHAEFER LAW FIRM LLC; Robert Treinen, TREINEN LAW OFFICE; and William H. Crowder, Vildan A. Teske, and Marisa C. Katz, CROWDER TESKE, PLLP, for plaintiff.

Brooks R. Brown and Richard A. Arculin, GOODWIN PROCTER LLP; and Mark G. Schroeder and Alan H. Maclin, BRIGGS AND MORGAN, P.A., for defendant.

Plaintiff Jody Zellner-Dion brings this putative class action against defendant Wilmington Finance, Inc. ("Wilmington"). Zellner-Dion alleges that Wilmington made, brokered, or originated mortgage loans that contain unlawfully high prepayment penalties in violation of Minn. Stat. § 58.137, subd. 2. Zellner-Dion commenced this action in state court, and Wilmington removed it to this Court under § 4(a) of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Zellner-Dion now moves to remand. For the reasons stated below, Zellner-Dion's motion is denied.[1]

---

[1] Wilmington moves to strike the declaration of Kiel McElveen, which Zellner-Dion submitted in support of her motion to remand. Motions to strike are not authorized by the Federal Rules of Civil Procedure or the local rules of this Court (except when they target a pleading, *see* Fed. R. Civ. P. 12(f)). Moreover, given that a party can always, in its brief on the merits, simply *ask* the Court to disregard a document filed by the party's opponent, formal "motions to strike" serve no purpose other than to crowd the docket and circumvent court rules
(continued...)

I.  CAFA

CAFA creates federal jurisdiction over class actions in which there is minimal diversity, there are at least 100 class members, and the amount in controversy exceeds $5 million.  28 U.S.C. § 1332(d)(2), (d)(5); *Westerfeld v. Indep. Processing, LLC*, 621 F.3d 819, 822 (8th Cir. 2010).  There is no dispute that the first two criteria are met here.  Wilmington and at least one putative class member are citizens of different states, and thus there is minimal diversity.  And both sides agree that the number of putative class members exceeds 100.  The parties dispute, however, whether the amount in controversy is met.

As the proponent of federal jurisdiction under CAFA, Wilmington bears the burden of proving, by a preponderance of the evidence, that there is more than $5 million in controversy. *Bell v. Hershey Co.*, 557 F.3d 953, 958 (8th Cir. 2009).  That does not mean, however, that Wilmington must prove that the putative class *will* recover more than $5 million.  Instead, Wilmington need only prove that a factfinder *might* award more than $5 million.  *Id.* at 959. Once Wilmington has met its burden, the burden shifts to Zellner-Dion to establish to a legal certainty that a factfinder will not award more than $5 million.  *Hargis v. Access Capital Funding, LLC*, 674 F.3d 783, 790 (8th Cir. 2012).  The amount in controversy is measured as of the time of removal.  *See id.* at 789.

---

[1](...continued)
limiting the number and length of memoranda.  Wilmington's motion is therefore denied.  *See Carlson Mktg Grp., Inc. v. Royal Indem. Co.*, No. 04-3368, 2006 WL 2917173, at *2 (D. Minn. Oct. 11, 2006).

## II.  THE PARTIES' CALCULATIONS

The parties' disagreement over the amount in controversy reflects their competing estimates of two variables: (1) the number of Wilmington loans that were prepaid and therefore incurred allegedly illegal prepayment penalties (or that still could be prepaid and incur allegedly illegal prepayment penalties under prepayment-penalty terms that have not yet expired[2]) and (2) for each loan, the maximum amount of the prepayment penalty that was (or still could be) incurred.

In her complaint, Zellner-Dion alleged that there are approximately 465 Minnesota residents who, within the past six years, entered into a mortgage contract that was made, brokered, or originated by Wilmington and that included a clause providing for illegal prepayment penalties.  Compl. ¶ 42.  Zellner-Dion based this estimate on a search of an electronic database of Minnesota mortgage filings.  Compl. ¶ 42; Arculin Decl. Ex. B at 2-3 (plaintiff's answers to defendant's first set of interrogatories).  Using the same database, Zellner-Dion also estimated that 332 of these mortgage loans had been prepaid — and that, at the time the complaint was filed, there were an additional 50 mortgages that were still subject to a possible prepayment penalty.  Compl. ¶ 42; Arculin Decl. Ex. B at 3.

Based on these estimates, Zellner-Dion alleged that there was less than $5 million in controversy.  Specifically, Zellner-Dion alleged that each of the 332 class members who prepaid their mortgages suffered no more than $7,830 in damages (which is the amount of damages that Zellner-Dion claims for herself) and that the remaining 50 class members who were still subject

---

[2]The prepayment-penalty provisions in the loans typically expire after a certain number of months or years.

to a possible prepayment penalty would collectively suffer no more than $400,000 in damages (or approximately $8,000 per class member). Together with Zellner-Dion's "anticipate[d]" 30 percent attorney's fee award, *see* Compl. ¶ 42, the total amount in controversy was approximately $3,899,428.

In response to the allegations in Zellner-Dion's complaint, Wilmington has offered evidence that it actually made 675 loans in Minnesota that contained the allegedly unlawful prepayment-penalty clause — 210 more than Zellner-Dion alleged in her complaint. Murphy Decl. ¶ 5. Wilmington then calculated an estimated prepayment ratio of 82 percent, which it derived from the number of loans that Zellner-Dion initially alleged (465) and the number of loans that Zellner-Dion alleged had either been prepaid or were still subject to a prepayment penalty (382).[3] Applying that ratio to the actual number of Wilmington loans (675) yields a class of 553 people. Finally, multiplying that number (553) by Zellner-Dion's alleged damages ($7,830) and adding a 30 percent attorney's fee yields an amount in controversy of approximately $5.6 million.

Zellner-Dion countered Wilmington's calculations by conducting a detailed analysis of the terms of each of the loans in an effort to more accurately estimate the average maximum damages suffered by each class member. *See* McElveen Decl. Ex. 3. For each loan,[4] Zellner-

---

[3]Wilmington followed Zellner-Dion's practice of distinguishing between the "damages" class (that is, class members who had prepaid their mortgages at the time the complaint was filed) and the "injunctive" class (that is, class members who had not prepaid their mortgages, but who were still potentially subject to a prepayment penalty, at the time the complaint was filed). For ease of discussion, the Court combines the two groups in its calculations. Zellner-Dion's objections to including the injunctive class are discussed below.

[4]There were a few loans for which information was not available; with respect to those
(continued...)

Dion determined what, in her view, was the maximum amount of the illegal prepayment penalty. These calculations yielded an average maximum amount of damages of $6,394.93 per class member. *Id.* Ex. 3 at 1. Assuming a class of 553 — a number that Zellner-Dion disputes but that she accepts for purposes of this calculation — the amount in controversy is below $5 million (even including a 30 percent attorney's fee).

Wilmington points out, however, that Zellner-Dion's average-damages calculation assumes that all class members suffered damages under Minn. Stat. § 58.137, subd. 2(a)(4). *See* McElveen Decl. ¶ 9. Subdivision 2(a)(4) places limits on prepayment penalties in certain circumstances.[5] But other subsections of subdivision 2 altogether prohibit prepayment penalties in certain other circumstances. For example, subdivision 2(a)(2) prohibits any prepayment penalty upon the sale of the property. Because Zellner-Dion failed to account for the fact that some class members may be entitled to recover the *entire* prepayment penalty, says Wilmington, Zellner-Dion's calculation understates the average maximum damages.

III. ANALYSIS

Wilmington has met its initial burden of showing, by a preponderance of the evidence, that it might be required to pay more than $5 million to the putative class. To begin with, the

---

[4](...continued)
loans, Zellner-Dion used conservative placeholders for the missing data.

[5]Specifically, subdivision 2(a)(4) permits a penalty that equals the lesser of (i) 2 percent of the unpaid principal balance of the loan at the time of prepayment or (ii) 60 days' interest on the unpaid principal at the rate applicable at the time of prepayment. The Court notes that Wilmington also points out that Zellner-Dion mistakenly used 2 months' worth of interest rather than 60 days' worth when calculating the permissible penalty under subdivision 2(a)(4)(ii). Because the difference is de minimis, however, the Court ignores it for purposes of this discussion.

Court agrees with Wilmington that Zellner-Dion's calculation of $6,394.93 in average maximum damages per class member is understated. Zellner-Dion defined the proposed class to include any borrower who was injured by a violation of *any* part of § 58.137, subd. 2. *See* Compl. ¶ 40. As noted, some violations of § 58.137, subd. 2, entitle the borrower to recover his or her full prepayment penalty. But Zellner-Dion failed to account for such recoveries in calculating the average maximum damages per class member.

In addition, Zellner-Dion is mistaken in asserting that the Court cannot consider the possibility of an attorney's fee larger than 30 percent of the total class recovery. Zellner-Dion could rely on that percentage as the maximum amount of available attorney's fees only if, before removal, she had stipulated that she would seek no more than that. *See Bell v. Hershey Co.*, 557 F.3d 953, 958 (8th Cir. 2009). She did not come close to doing so; she simply alleged in her complaint that she did not "anticipate" seeking more than a 30 percent fee. Such a prediction does not prevent her from seeking fees far in excess of 30 percent. Notably, a very slight upward revision in the average maximum damages (to $6,800 per class member, which is over $1,000 less than Zellner-Dion claims for herself) and a very slight upward revision in the anticipated attorney's fee (to 33 percent, instead of 30 percent) would yield an amount in controversy of over $5 million even if the class were limited to 553.

In the Court's view, however, it is not necessary to limit the size of the class to 553. There are 675 Minnesota residents who obtained Wilmington loans that were subject to an allegedly unlawful prepayment-penalty clause, and thus there are 675 potential class members who might be able to recover damages. Even adopting Zellner-Dion's understated measure of

average maximum damages and her artificially limited estimate of attorney's fees, 675 class members yields an amount in controversy of approximately $5.6 million.

Zellner-Dion argues that the amount in controversy should not be based on the entire group of 675 loans because Wilmington has not shown that any, much less all, of these loans were prepaid (putting aside Zellner-Dion's own loan).  But requiring Wilmington to establish the *actual* number of loans that were prepaid in order to meet its burden to show the amount in controversy would be inconsistent with the standard that the Court must apply.  The proponent of federal jurisdiction is not required to prove that damages *will* exceed the jurisdictional amount.  Instead, the proponent need only prove that the damages *might* exceed the jurisdictional amount.  In other words, the proponent need prove what is possible, not what is likely.  *See Kopp v. Kopp*, 280 F.3d 883, 885 (8th Cir. 2002).

To discern the outer boundary of what the plaintiff class could recover — the defendant's worst-case scenario — the Court must identify the number of parties who could *possibly* be included in the class and the most that each of those potential class members could *possibly* recover, and then add attorney's fees.  Here, the Court knows that there are 675 members of the class, the Court knows that it is possible that every one of the 675 paid a prepayment penalty, and the Court knows that it is possible that every one of the 675 is entitled to a refund of the full prepayment penalty.  The information provided by the parties does not permit the Court to easily estimate the total amount of prepayment penalties paid by all members of the class.  But if the Court merely multiplies the number of class members (675) by what Zellner-Dion herself claims is the average maximum damages that each class member suffered ($6,394.93) — and the Court

then adds the 30 percent attorney's fee that Zellner-Dion anticipates seeking — the amount in controversy substantially exceeds the $5 million threshold.

Zellner-Dion compares this case to *Cotton v. UnitedTel, LLC*, No. 09-656, 2009 WL 2461709 (D. Minn. Aug. 10, 2009), in which the court declined to speculate that the class was large enough to yield more than $5 million in controversy. In *Cotton*, however, there was no evidence — *none* — about the potential size of the class. As a result, the court simply had no way of even estimating the largest possible class size — and thus, the court had no way of knowing whether the class could be large enough to generate the jurisdictional minimum amount of damages. Here, by contrast, there is proof that the potential class could be as large as 675 members, and there is evidence that permits the Court to find that those 675 members could recover well in excess of $5 million. Wilmington has thus met its burden of showing, by a preponderance of the evidence, that it is possible that the recovery in this case will exceed $5 million.

Zellner-Dion argues that the Court should essentially ignore the injunctive class — that is, the members of the class who, as of the time of removal, had not prepaid their loans (and therefore had not paid the allegedly unlawful penalty) but were still subject to unexpired prepayment-penalty provisions. This is so, says Zellner-Dion, because as of January 31, 2011 there were no longer any loans with an unexpired prepayment-penalty term. The short answer to this argument is that the amount in controversy is measured as of the date of removal. *See James Neff Kramper Family Farm P'ship v. IBP, Inc.*, 393 F.3d 828, 833-34 (8th Cir. 2005). It is true, as Zellner-Dion argues, that the Court should consider the entire record as it bears on the amount in controversy, even if the record was not developed until after removal. *See id.* But the focus of

the Court's inquiry remains the amount in controversy as of the date of removal, and events that occur after the date of removal cannot divest the Court of jurisdiction. *Id.*

Finally, Zellner-Dion argues that the Court should ignore the injunctive class because Wilmington assigned virtually all of its loans to non-parties whom the Court does not have the power to enjoin. But this argument proves too much. If it is true that Wilmington assigned all of its loans to others, then the *damages* class would appear to suffer from the same problem as the *injunctive* class. Section 58.137 provides that residential mortgage originators "shall not *charge*, *receive*, or *collect* any prepayment penalty . . . ." (Emphasis added.) If Wilmington assigned a loan before the borrower prepaid, then it was the assignee, and not Wilmington, who "charge[d], receive[d], or collect[ed]" any prepayment penalty. Yet Zellner-Dion nevertheless seeks to hold Wilmington liable in damages under this provision.

To be clear: The Court is not deciding, at this stage, whether Zellner-Dion's damages claims against Wilmington are viable. The Court simply observes that, given that Zellner-Dion's damages claims (like her injunctive claims) depend on imposing liability on Wilmington for the acts of others, the Court sees no reason to distinguish between the damages class and the injunctive class for purposes of determining the amount in controversy.

Because Wilmington has met its initial burden, the burden shifts to Zellner-Dion to show, to a legal certainty, that it is impossible for a factfinder to award damages exceeding $5 million. As discussed above, Zellner-Dion attempts to meet this burden by offering what she believes is a more-accurate estimate of the average maximum amount of damages that each class member may recover. *See* McElveen Decl. Ex. 3. There is no doubt that, by taking a detailed look at the actual terms of the loans, Zellner-Dion has engaged in exactly the type of analysis that would be

necessary to show that it is legally impossible for damages to exceed $5 million. And Zellner-Dion may eventually discover sufficient facts to show that, at the time of removal, it was legally impossible for the plaintiff class to recover more than $5 million.[6] For the time being, however, Zellner-Dion's analysis falls short. While she may have offered a more-accurate estimate of the amount of the likely recovery in this case, she is still estimating — and, like all estimates, hers reflects various predictions and assumptions that could turn out to be inaccurate. Zellner-Dion must prove to a legal certainty that plaintiffs cannot recover more than $5 million, and her estimate, being an estimate, cannot do that.

In short, Zellner-Dion has not met her burden of establishing that it is legally impossible for damages to exceed $5 million in this case. Her motion to remand is therefore denied.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Plaintiff's motion to remand [ECF No. 51] is DENIED.

2. Defendant's motion to strike [ECF No. 58] is DENIED.

Dated: July 19, 2012         s/Patrick J. Schiltz
                             Patrick J. Schiltz
                             United States District Judge

---

[6] The Court notes, however, that if punitive damages are available, that fact alone would establish that there is more than $5 million in controversy. Because it is not clear whether punitive damages are in fact available, the Court has not included them in its analysis.